## Hardy v. Russell.

## Felts v. Edwards.

## Bailey v. Stuart.

(Decided June 21, 1918.)

## Appeals from Logan Circuit Court.

1. Statutes—Section 1596a, Sub-section 12—Construction—Appeal and Error.—In construing section 1596a, sub-section 12, Ky. Stat., where it provides, that, one, appealing from a judgment of the circuit court to the Court of Appeals, shall execute a bond ."to the clerk," held that the preposition "to" was inadvertently or carelessly used, and that the word "before" should be substituted for the word "to."

2. Statutes—Construction.—In the construction of a statute, where the object of the legislature is plain and its intent can be ascertained with certainty from the entire context, and it is apparent therefrom, that a word has been inadvertently or carelessly used, the word intended will be substituted for the one used, if it is necessary to give effect to the purpose and intent of the legislature, as gathered from the entire statute.

3. Appeal and Error—Refusal to Permit Filing of Pleading.—The action of the trial court in refusing to allow a pleading to be filed, which is presented in term time, can not be reviewed, unless the pleading is identified by a bill of exceptions or an order of the court and made a part of the record, otherwise, it is private paper in the hands of the party.

4. Pleading—Filing Answer in Vacation—Demurrer—Notice.—A party, who files an answer in vacation, may file a demurrer to the petition, with. it, and the plaintiff may during that vacation file an amended petition with the clerk to correct the errors in his petition, but he must before doing so give to the defendant notice of his intention to do so, and if he fails to give such notice, the court should strike it from the files upon motion of the defendant, or else the provisions of section 109, Civil Code, would be nullified.

5. Pleading—When Becomes Part of Record—Trial.—A paper filed with the clerk, whenever it is permissible to do so, becomes a part of the record, but to lodge a pleading with the clerk when there is no authority to do so or without having taken the necessary steps to make the filing lawful, although marked filed by the clerk, it does not become properly a part of the record, unless the parties treat it as having been filed and permit the court to act upon it as such without objection at the trial.

6. Elections—Contest—Pleading.—A contestant, in a contest of an election, may file an amended petition to cure a ground of contest defectively stated in his petition, but he can not set up any new ground of contest in the amendment, and in the filing of same he is governed by the provisions of the Civil Code, in reference to amendments after the filing of the answer.

7. Pleading—Motion to Strike From—Surplusage.—A motion to strike from a pleading can only be made to apply to surplusage, irrelevant or redundant matter therein, and can not be made to do the office of a demurrer, and it is error to strike from a pleading, upon such motion, facts, which constitute a necessary statement of the cause of action or defense relied upon, although the cause of action or defense is defectively stated.

8. Elections—Construction of Booths—Failure to Provide.—The requirements of section 1467, Ky. Stats., as to the construction of the booths to be used in voting are directory, and the failure, of the election officers to provide booths constructed in compliance with the requirements of the law, will not vitiate all the votes cast at the election, provided the mandatory requirement of the constitution, that the ballot be a secret one, is preserved.

9. Statutes—Directory Statutes.—Statutes, which give directions for the accomplishment of an end, although the end to be accomplished is mandatory, are directory, and if the end is accomplished, it is not affected by a failure to comply with the directions for its accomplishment.

10. Elections—Corrupt Practices in—Statute Against.—The statute against corrupt practices in elections, so far as it requires the filing by a candidate of a pre-election, as well as a post election, statement of his expenditures, as a candidate, is a mandatory requirement and must be complied with or else his election is void, but the requirement as to the time of its filing is directory, and a substantial compliance with the statute, under the circumstances of each particular case, is sufficient.

11. Elections—Registration.—Voters who reside in a city, wherein registration is required, can not legally vote without having registered, and without presenting or offering to present their certificates of registration to the election officers.

12. Elections—Contest.—Where all the illegal votes cast in an election can be separated from the legal ones, and all deducted from the poll of the successful candidate, and he still has a majority of the votes cast and is elected, although to deduct them all from

the votes received by him is manifestly unjust to him, when it is not shown that they all voted for him, his opponent is without right of complaint.

13. Elections—When Will Not be Set Aside.—Elections held by and for all the people will not be set aside because of sporadic instances of bribery, with which the successful candidates are not shown to be connected and which have not affected the general result, as in every election some one may be expected to do something wrong, as in every other affair of life.

PROCTOR & GARDNER, W. R. GARDNER, B. F. PROCTOR and J. U. WADE for appellants.

BROWDER & BROWDER, S. R. CREWDSON and E. COLEMAN TAYLOR for appellees.

OPINION OF THE COURT BY JUDGE HURT—Affirming in each case.

These appeals, which have heretofore been ordered to be heard together, are from the judgments, of the Logan circuit court, determining the contests of election to the office of county judge, county clerk and sheriff, respectively, in favor of the appellees. The pleadings, steps, motions, grounds of contest and counter contest, as well as the evidence is substantially the same, in each action, the differences being the names of the parties, and the number of the votes received by each party respectively. Preliminary to the submission of the causes upon their merits, two motions were made in this court, in each of the causes, by the appellees, respectively, and these motions were passed for hearing to the final submission and will now be disposed of.

(1) The appellees in each of the causes made a motion to dismiss the appeal, upon the ground that the appellant had failed to execute the bond required by section 1596a, subsection 12, Ky. Stats. The statute, *supra*, so far as it pertains to the question in hand, provides:

"Either party may appeal from the judgment of the circuit court to the Court of Appeals, by giving bond *to* the clerk of the circuit court, with good surety, conditioned for the payment of all costs and damages the other party may sustain by reason of the appeal, and by filing the record in the clerk's office of the Court of Appeals within thirty days after final judgment in the circuit court."

The appellants within thirty days after the final judgment appealed from, executed bond, conditioned as

an ordinary supersedeas bond, with sureties and filed the record in the office of the clerk of this court. In each case, the appellant executed the bond to the appellee and before the clerk of the circuit court. One of the conditions of the bonds is, that, the appellant will pay to the appellee all costs and damages, which the appellee will sustain by reason of the appeal. The appellees being now in the custody of the offices over which the contests were made, all the costs or damages, which the appellees could sustain by reason of the appeal, if the judgment should be affirmed, is the cost which he will have to pay by reason of the appeal. Hence, the covenants of the bond seem to be sufficient to protect all the rights of the appellees. The bond is not defective, as was the bond in Galloway v. Bradburn, 119 Ky. 49, as, in that case, the covenants, in the bond, were insufficient to protect the rights of the appellee, in the event of the affirmation of the judgment. The contention is made for the appellees, however, that the bond is fatally defective, in that the bonds are executed *to* the appellees, instead of *to* the clerk of the circuit court. It will be observed, that the statute does not provide, that the execution of the appeal bond shall be, in any wise, for the benefit of the clerk or that anything shall be secured to him or redound to him, in any way, by reason of its execution. It is required to be executed, solely, for the benefit of the appellee and to secure him in the satisfaction of any costs or damages, which he may sustain by reason of the appeal. The correct construction of a statute, always, is, to ascertain the intention of the legislature in enacting it and to declare such intention. Trustees v. City, etc., 97 Ky. 702; Day v. Brooks, 8 R. 429; Board, etc. v. Fiscal Court, etc., 106 Ky. 608; Grinstead v. Kirby, 33 R. 287. To ascertain the intention of the legislature, it is proper to look to the purpose, which it had in view in enacting the statute, the subject matter and the entire context of the statute and the consequence of its enactment. Com v. Trent, 117 Ky. 34. The general rule of interpretation is, that effect must be given to every word in a statute, but where the object of the legislature is plain and its intent can be ascertained with certainty from the entire context, and it is apparent from the context, that a word has been inadvertently or carelessly used, the purpose and intent of the legislature will not be allowed to be defeated by the inadvertence, but the word intended will be substituted for the one used, if it is necessary to give effect to

the purpose and intent of the legislature, as gathered from the entire statute. Bird v. Board, etc., 95 Ky. 195; Mason v. Rogers, 4 Litt. 376; Phillips v. Pope, 10 B. M. 172; Williams v. Com., 78 Ky. 93; Mercer County Court v. Galbert, 5 Bush 446; L. & N. R. R. Co. v. Com., 97 Ky. 675; Com. v. Reynolds, 89 Ky. 147 It is very plain, that, the purpose and intention of the legislature was to require a bond to be executed by one, who appeals a case involving a contest for the right to hold an office and to receive its emoluments, which will be for the benefit of the appellee and will insure, that he shall be paid any costs or damages, which he shall sustain by reason of the appeal, and hence, that, it was the purpose and intention of the legislature that the covenants of the bond should be made to the appellee, who is the sole person in interest. It was necessary to designate some person, before whom the bond should be executed and who should have authority to accept same and for such reason, alone, the clerk was designated. Hence, the word "to" preceding the word "clerk" was manifestly inadvertently or carelessly used, when the word "before" was intended and should be substituted for it. The motion to dismiss the appeals for a failure to execute the appeal bond to the proper person and at the proper time is therefore overruled.

(2) The motions to strike out of the records the amended petitions, copied therein, by the clerk must, also, be overruled. It is urged, that, this motion should prevail because the records only show that an amended petition was offered, in open court, in each of the causes, and the court refused to permit it to be filed, and that there was no order of the court, which identified the amended petitions, copied into the records, as the ones offered and refused, and for that reason they can not constitute any part of the respective records. The action of the trial court in refusing to permit a pleading to be filed can not be reviewed, of course, by this court, unless the pleading is made a part of the record by a bill of exceptions or by an order of the court, which will designate it, as the one offered and refused. Young v. Bennett, etc., 7 Bush 474; Noland v. Feltman, 12 Bush 119; Jett v. Farmers Bank, 25 R. 817; Mitchell v. New Farmers Bank, 22 R. 1291; Dudley v. Herring, 30 R. 27; Oldham v. Brown, 4 Bibb 544. Neither the orders of the court setting out the motions to file amended petitions, nor the orders overruling the motions, designates the amended petition of-

fered to be filed and refused, as the one, which is copied into the record. Neither can the action of the trial court in refusing to allow the amended petition, which was offered and refused, be reviewed, as in the absence of the pleading offered, it can not be assumed, that the ruling of the court was not correct.

(3)   The trial court struck from the files of the case an amended petition which was filed with the clerk, in vacation on the 14th day of January, 1918, and the appellants insist that this was erroneously done and that they were entitled to the benefit of the averments therein, upon the trial below and here.  To determine the soundness of this contention it will be necessary to make a review of the state of the pleadings.  The petitions were each filed on the 17th day of November, 1917  The answers were filed on December 7th, thereafter.  The replies were filed on December 15th, thereafter.  The appellants alleged in their petitions, together with other grounds of contest, that ninety-six illegal votes had been cast and counted for their opponents in the Keysburg precinct.  The names of the persons who cast these votes were fully set out, but no facts were alleged, which showed why the votes were illegal and in this the petitions were defective.  It was, also, alleged, that the election, in Keysburg precinct, was so irregular, that it did not amount to an expression of the will of the legal voters therein; that the voting was without secrecy; the booths had neither doors nor curtains, and that one hundred persons had voted there in such a way as to expose their ballots to the clerk and other officers of the election, who knew for whom the ballots were cast, and for that reason the vote of the entire precinct should be eliminated.  It was further alleged, that the appellees each failed to comply with the statute, against corrupt practices, in elections, in that they had failed to file with the chairman of the board of election commissioners a statement of their respective expenditures in the election fifteen days before the election and had, also, failed to file the required statement after the election, as required by section 4, chapter XI, Session Acts 1916.  When the appellees filed their answers, they filed with them a motion to require appellants to make more specific the allegations of their petitions, and a general demurrer to the petitions, as a whole, and to each paragraph of them.  Thereafter, on the 14th day of January, 1918, the appellants each filed in the office of the clerk of

the court, the court being then in vacation, amended petitions, by which they cured the defects in the paragraphs of the original petitions with reference to the Keysburg precinct and, also, some additional, but immaterial, averments with reference to the failure of the appellees to file the statements of their election expenditures, as required by law against corrupt practices, and, also, relied upon an alleged new ground of contest to the effect, that the chairman of appellee's party campaign committee had failed to file statements of the expenditures made by him, as required by law. No notice of the filing of the petitions in the clerk's office was given to the appellees, and when the circuit court convened, they moved the court to order the amended petitions to be stricken from the records of the respective cases and this motion was sustained in each case, to which appellants excepted. Section 1596a, subsection 12, Kentucky Statutes, provides for the filing of the petition, answer and reply in a contest of an election, and then provides, that the action shall proceed as an equity action. Section 132, Civil Code, provides, that a plaintiff may, at any time, before the answer is filed, amend his petition without leave of the court, but unless the amendment is filed five days before the term to which the defendant is summoned to answer, he shall give to the defendant notice of one day of his intention to amend. Section 134, Civil Code, provides that the court may, in furtherance of justice, cause or permit a pleading to be amended by inserting the allegations material to the case, or by conforming the pleading to the facts proved. Section 109, Civil Code, provides that a party, who files an answer or subsequent pleading during vacation, may file a demurrer with it, and that the adverse party may, during that vacation and after notice to the party filing the demurrer or his attorney, file an amended pleading to cure any defect suggested by the demurrer. The appellees having filed answers at the time required by law and filed demurrers therewith, the appellants could not, thereafter, in vacation, properly file amended petitions in the office of the clerk, without first having given notice to their adversaries of their intention to do so. A paper filed with the clerk, whenever it is permissible to do so, becomes a part of the record. Miller v. Foley, 4 Bibb 200; Carter v. Stinnett, 10 B. M. 253; Bowler v. Lane, 3 Met. 311. But, to lodge a pleading with the clerk, when there is no authority to do so or without having taken the steps necessary to make the filing lawful, and although

it is filed by the clerk, it does not become properly a part of the record. If the court should upon motion refuse to strike an amended petition from the files, when it was lodged with the clerk, in vacation, and after answer, and, without notice and it should be endorsed by the clerk as filed, it would have the effect to nullify section 109, subsection 2, of the Civil Code, although it might be such a pleading as the court, in the exercise of its discretion, might properly permit to be filed in term time, according to the provisions of Section 134, Civil Code. For a violation of the provisions of section 109, *supra,* there would be no remedy, except to order the pleading stricken from the files, because, if the opposing party should permit it to remain and treat it as being a pleading in the case and filed properly therein and permit the court to so act upon it, upon the trial, upon an appeal, it would be held to be a sufficient filing. Day, etc. v. Mack, etc., 24 R. 640; Shields v. Lewis, 24 R. 822. Hence, the court was not in error in striking the amended petitions lodged with the clerk and marked filed by him on the 14th day of January. While it has been frequently held, that, where a ground of contest is defectively stated in the petition, a plaintiff may cure it by an amended petition filed after the time provided by law in which to file an original petition, but he can not introduce any new ground of contest in such amendment. Butler v. Robertson, 158 Ky. 101; Adams v. Roberts, 119 Ky. 364; Francis v. Sturgill, 163 Ky. 650; Weller v. Munninghoff, 155 Ky. 77. But the matter under consideration, here, does not involve the question of the right to amend a ground of contest defectively stated in the petition, but the question presented here, is as to the time and manner in which it must be done, if done at all.

(4) Several of the paragraphs of the petitions stated the grounds of contest relied upon, in them, defectively, and were not sufficient upon demurrer, but as the court overruled the demurrers to each of the petitions as a whole, as well as to each paragraph of them and the appellants can not complain of the failure to sustain the demurrers to their petitions, the court's ruling upon the demurrers will not be further considered.

(5) The court, however, sustained, in large part, the motion of the contestees to strike out various parts of their adversaries' petitions, which will not be necessary here to particularly set out. Suffice it to say, that

there was no surplusage in the petitions, nor redundant nor irrelevant matter and nothing which could not be considered, as a proper part of the allegations, regarding the matters complained of, and hence there was nothing in the petition to be stricken out. A motion to strike out of a pleading can not be substituted for nor to do the office of a demurrer, and the things stricken out were statements of facts, which were necessary to constitute the contestants' cause of action. Hence, the court was in error in sustaining any part of the motions to strike out any matters from the petitions. Although contestees had filed before their answers, motions to require the contestants to make more explicit and definite the allegations of their petitions and which motions should have prevailed, they did not choose to call the motions to the attention of the court or to cause any ruling to be had upon them and hence must be considered to have waived any objections on that ground. With the stricken portions of the petitions restored, and it must be so considered, the petitions, answers and replies considered together, substantially present the issues, in the actions and were sufficient to bring to the attention of the court, the necessary and essential things to be considered and to enable it to decide the causes properly, upon their merits. All the proof of the grounds of contest and counter contest, which either party desired, was taken and is brought up in the records.

(6) For the office of county judge, contestant, Homer Felts, received 2527 votes and the contestee, John W. Edwards, received 2681 votes and a majority of 154 votes. For the office of clerk of the county court, the contestant, R. L. Hardy, received 2378 votes and the contestee, G. C. Russell, received 2731 votes and a majority of 353 votes. For the office of sheriff, the contestant, G. Wash Bailey, received 2426 votes and the contestee, V. H. Stuart, received 2723 votes and a majority of 297 votes. Each of the contestants, who are the appellants here, relied upon the same grounds of contest, which were:

(1) That persons, who did not reside in the state of Kentucky and others who did not reside in the county and who lesided in the county, but not in the precinct in which they voted, and others, who had not resided in the state for one year and in the county six months nor in the precinct sixty days, had voted for their opponents and the votes had been received and counted for them.

(2)   That persons were permitted to vote for their opponents, who exposed their ballots so that others could see how they voted, and others voted for their opponents, whose ballots were marked for them by the officers of the election or were stamped by the officers of the election for them without their having taken an oath as to their inability to mark their ballots by reason of being unable to read or by reason of physical disabilities.

The names of the voters alleged to have voted illegally, for the reasons and in the ways above stated, were set out and the precincts in which they voted, except in the Keysburg precinct. As to this precinct, the names of the alleged illegal voters were stated in the petition, but the facts showing their illegality were not alleged and the contestants were not required to make the allegations in regard to them more specific.

(3)   In the Keysburg precinct the voting was done openly and not by secret ballot, and the entire vote of the precinct should be eliminated from the contest.

(4)   The contestees and others, in their behalf and with their knowledge, expended large sums of money, in the bribery of voters, to cast their ballots for contestees, and had purchased or caused to be purchased from one hundred and fifty of the voters in Russellville their registration certificates, that being a city of the fourth class, in which voters were required to register, in order to entitle them to vote, and thus deprived them of their right of suffrage and contestants of one hundred and fifty votes each.

(5)   The contestees failed to make out, swear to and file with the chairman of the board of election commissioners an itemized statement of their expenses, growing out of their respective candidacies, fifteen days preceding the election and had, also, failed to file such statement after the election, as required by the law, against corrupt practices in elections.

(6)   The contestees each expended more than one thousand dollars in promoting their candidacies, the county being one where in there was a city of the fourth class only.

(7)   The contestees denied all of the averments in the petitions and set up counter grounds of contest as follows:

(a)   Various named persons, who were not entitled to vote for various statutory reasons, in the various precincts, had voted for contestants.

(b)   Various persons, naming them, had voted for contestants, and, who voted openly and exposed their ballots, and others voted for contestants, whose ballots were marked for them by the clerk of the election, without such persons having taken an oath, that, they were unable to mark their ballots by reason of illiteracy, and others had voted for contestants, whose ballots were stamped by the officers of the election for them without their having taken oaths, that they were unable to mark or stamp their ballots by reason of their physical infirmities.

(c)   The elections held in two or more precincts which gave majorities against contestees, were open and not held by secret ballot.

(d)   Many persons, naming them, had voted for contestants, who were residents of Russellville, a city of the fourth class, and who had voted without presenting or offering to present their certificates of registration to the officers of the election. The grounds of counter contest were all denied by replies.

(8)   A very large mass of testimony was taken, by each side, in the endeavor to prove, that, persons, not legal voters, had voted for their opponents, in the various polling places in the county. The number of these persons, whose right to vote was attempted to be impeached is too great either to set out their names or the facts proven in regard to them. Strange to say, many of them had been residing, out of the county, or, out of the precincts in which they voted, for many years, but continued to vote at a voting place from year to year, under the mistaken idea, that, they could reside with their families and have homes for all purposes in one place and vote at another without having exercised any rights of citizenship there, except that of the mere right to vote. Of those, whom the contestants charge with voting illegally because of not having voted in the proper place, the evidence proves, that, thirty-nine of them voted in the election in the different precincts, who were not entitled to vote, because they did not reside in the county or in the precinct in which they voted or else had not resided in the county or precinct the requisite length of time to entitle them to exercise the right of suffrage in such place. Of those, whom the contestees endeavored to show had illegally exercised the right of suffrage for the same reasons, the evidence proves, that, they were thirty-eight in number. Concerning these seventy-seven persons there

was no evidence proving for whom they voted, whether for contestants or contestees or for one or more of each, except in possibly two or three instances. The only evidence offered, to prove, for what candidate these persons voted, was to prove the political beliefs usually considered to be held by the voters, which alone is not sufficient to determine how any one votes by secret ballot in an election for county officers. It is impossible to tell what effect, if any, their voting had upon the result of the election.

(9)   Of the persons, who voted and who were proved to have exposed their ballots or whose ballots were marked by the clerk of the election for them without their having first taken an oath that they were unable to mark their ballots because of illiteracy, or whose ballots were stamped for them by the clerks, without they having first taken an oath that they were unable to stamp or mark their ballots, because of blindness or physical infirmity, twenty-four voted for the contestants and five for the contestees, other than those, who voted at the Keysburg polling place.

(10)   In the election held in the Keysburg precinct, the contestees received majorities of about two hundred votes over their opponents. The election was held in an upstairs room which was approached by a stairway, which led up from the outside to a door. From the door to the opposite side of the room, where there was a window, was about twenty feet. The desk, used by the clerk of the election and where the judges of the election sat, was upon one side of the window, while the voting booths were at a distance of from twelve to fifteen feet on the opposite side of the window. There were three voting booths about three feet in depth, within which the voters who used the booths stamped their ballots. These booths were provided with a narrow shelf upon which the voter did the marking of his ballot. It is not proven nor is it pretended that any officer of the election could see or know how any voters marked their ballots who used the booths for that purpose. The location of the clerk and the judges of the election was such that it was impossible for them to see, and the sheriff, who usually stood near the door, twenty feet away from the voter, could not see how the voter marked his ballot; because the voter was between him and the ballot. The sheriff, who seems to have been a partisan of the contestants, testified and he does not pretend to

have known how any voter marked his ballot, who made use of one of the booths for that purpose. There was, however, no door or curtain to either of the booths. The booths, however, were so situated, that the officers of the election could see whether more than one voter entered a booth at one time, and it does not appear, that any persons, other than the election officers and the persons admitted for the purpose of voting, were permitted to be in the room, while the vote was being polled. So it seems, that the booths complied with the requirements of the law, as stated in section 1467, Kentucky Statutes, except the failure to have a door or curtain in front of the booth. While it is alleged, that the clerk accompanied voters to the booth, there is no satisfactory proof of this and it is denied expressly by the clerk. The statute gives explicit directions as to the construction of the booths and should be in all cases complied with, because the purpose of the statute is to provide means to secure the secrecy of the ballot. That the ballot shall be secret is a constitutional and a mandatory requirement and necessary to every valid election, but statutes which give directions to accomplish an end and the end can be accomplished and the merits of the case unaffected, although the directions are not complied with, the directions are considered as merely directory and not mandatory. Varney v. Justice, 86 Ky. 596. The weight of authority is to the effect, that, if the election officers fail to provide booths, which, in their construction, comply with the requirements of the law, it does not render the election void, but is a mere irregularity which does not vitiate the election, always providing, however, that the essential thing of the secrecy of the ballot is preserved. 15 Cyc. 363, 11 R. C. L. 1108. Hence, in the present instance, it does not seem, that the mere fact that the booths were not provided with a door or curtain in front does not vitiate the entire poll. There was evidence for the contestants, which conduces to show that as many as forty or fifty voters at this precinct marked their ballots upon the clerk's table or the clerk marked and stamped their ballots for them without any of them having been required to take an oath, that, they were unable to read or write or unable to mark or stamp their ballots by reason of blindness or other physical infirmity. The evidence, however, for contestees is to the effect that not over five or six persons voted in this manner and the names of not more than two or three voters are given who voted in this manner, nor for whom they

voted is proven, except as to the ones designated by the proof. The effect of the last mentioned irregularity will be considered further.

(11) The charge of wholesale bribery brought against the contestees is not sustained. The charge, that, one hundred and fifty registration certificates, were purchased, before the election from the holders of them so as to prevent their voting fails entirely, as there is no proof that any registration certificate was purchased by any one from any person or that any person failed to vote on account of not having a registration certificate. In three or four instances, in different parts of the county, there is proof shown that two or three persons in these different precincts were given money to vote for the contestees, but in each instance, except one, this proof is made by the party who claimed to have sold his vote and was denied under oath by the persons whom they charged with furnishing them the money. Further, the persons, who it is claimed, furnished these voters with money are not shown to have done so, if they did do so, with the knowledge, or consent of either one of the contestees. It would be unreasonable to set aside elections held by and for the benefit of all the people because of sporadic instances of bribery, with which candidates are not connected, as in all elections some one may be expected to do wrong, as in every other affair of life.

(12) A considerable quantity of evidence was taken upon the issue as to whether or not the contestees, each, filed a statement of his expenditures, as a candidate, fifteen days preceding the election and after the election, as required by law. It seems to be conceded, that, the statements were filed, but it is claimed, that, they were not itemized, as the law required. The absence of the statements, or copies of them, from the record, precludes us from determining, whether, they were in such form and substance as is required by law. Evidence is, also, offered to prove that the chairman of the board of election commissioners was not in Russellville upon the day, upon which it is claimed, that the pre-election statements were filed with him, and that instead thereof, they were filed with the clerk of the county court. However, each of the contestees testifies that he was in Russellville upon that day and that the statements were filed with him, and the evidence to the contrary does not preclude the possibility of him having been in Russellville upon that day, but conduces to prove that he took a train at

Diamond Springs for Russellville late in the afternoon of that day. The filing of the pre-election as well as the post election statement, by the candidate, is a mandatory requirement and, if he fails to do so, he can neither accept nor hold the office to which he is elected, but the requirement as to the time, when the statement should be filed, is directory, and a substantial compliance with the law under, the particular circumstances of the case, in that regard is sufficient. Sparksman v. Saylor, 180 Ky. 263. The evidence, in our opinion, fully conduces to prove that the statements were filed with the chairman of the board of election commissioners in substantial compliance with the law, under the particular circumstances of the case.

(13) The ground of contest, which alleged that the contestees had each spent more than one thousand dollars in promoting their elections seems, also, to have entirely failed for want of evidence to support it. The post election statements filed by them show that they spent one hundred and fifty dollars, each, which was furnished to the chairman of their campaign committee for the purpose of conducting an automobile tour with a brass band, throughout the county, and in the preparation and sending out literature in their behalf, and each deposed, that, if any part of that sum was spent in an improper way, they had no knowledge of it nor was it done by their consent or direction. A voluntary witness, who is induced to come to the place of taking his deposition by a partisan of the contestants, does testify, that, the contestee, Stuart, stated to him, that if he would attend the election and vote for him, he would insure him "railroad wages," and that on the day following the election, Stuart gave to him, one dollar. This, however, Stuart emphatically denies, and it is proven by other evidence, that, he was not at the place, at the time, when the witness deposes that the proposition was made to him. Hence, the weight of the evidence seems to prove that the charge is without merit. This is the only evidence worthy of consideration, which tends to prove that either of the contestees spent any money in promoting his election, other than the sum reported by them in their statements.

(14) The contestees alleged, that, a large number of voters, had voted for their opponents, in the precincts in Russellville, who were registered voters, but, who

did not present their certificates of registration nor offer to do so. That such persons as these are not entitled to vote is very clear. Constitution, section 147; section 1488, Kentucky Statutes; DeHaven v. Bowmar, 125 Ky. 800; Com. v. Glass, 140 Ky. 589; Taylor v. Betts, 141 Ky. 138. The proof upon this subject, however, is exceedingly contradictory and the most, which it definitiely proves is, that certain well known citizens did not present their registration certificates nor offer to do so, but that all others did so or were required to do so, and that many were not permitted to vote, until they would return to their homes and secure their certificates of registration. There is no evidence, for whom the few voted, who did not present their certificates, but, who were otherwise legal voters and in fact had certificates, and hence there is nothing in the record sufficiently presented by the evidence to enable us to announce any opinion as to whether the result of the election was affected by any of these voters. Wallbreck v. Ingram, 164 Ky. 468.

The election seems to have been orderly and quiet and that there was no such fraud, bribery or intimidation, at either of the voting places to justify eliminating it from the count of the votes. While it would be manifestly unjust to take the entire number of illegal voters, where it is not shown for whom they voted, from the votes counted as received by the contestees, because, it would be unreasonable to conclude that all of them voted for the contestees, but, if such can be done and a majority still exists for the contestees, it is very clear that they were elected and had received a majority of all the legal votes cast and the contestants will have no complaint. Hence, deducting from the number of votes received by the contestee, Edwards, whose majority was the least, the entire number of illegal votes proven to have been cast, by persons voting, where they were not entitled to vote, which amount to seventy-seven, as heretofore stated, and conceding that fifty votes cast at Keysburg precinct were voted illegally "upon the table," and the five votes cast for him at other points by voters voting "upon the table," he is still left with 2549 legal votes. Deducting from the votes certified as received by his opponent, Felts, amounting to 2527 votes, the twenty-four votes, which it is proven were cast for Felts by voters who voted openly and "upon the table," would leave the number of legal votes received by him at 2503, which would yet leave for Edwards a clear majority of forty-

six votes of the legal votes. The majority upon the face of the returns for Russell being 353, and deducting from his vote of 2731, five votes proven to have been received by him illegally, by persons who voted "upon the table," other than in Keysburg precinct, the seventy-seven votes cast for him and his opponent, together, by reason of the voters not voting in their proper precincts, and the fifty votes illegally cast for him and his opponent, together, in the Keysburg precinct by persons who voted "upon the table," and deducting from the votes cast for his opponent the twenty-four illegal votes received by him, by persons voting "upon the table" in other parts of the county, would leave Russell a majority of 245 of the legal votes. The same subtractions from the votes received by Stuart and Baily would leave Stuart a majority of 189 votes.

The judgment in each case is therefore affirmed.

Chief Justice Settle not sitting.